IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

BETHANY COLEMAN-FIRE,

                Plaintiff,

       v.

STANDARD INSURANCE COMPANY,

                Defendant.

Case No. 3:18-cv-00180-SB

**FINDINGS OF FACT AND
CONCLUSIONS OF LAW**

**BECKERMAN, U.S. Magistrate Judge.**

        Bethany Coleman-Fire ("Plaintiff") brings this action under the Employee Retirement

Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001–1461, challenging Standard

Insurance Company's ("Defendant") decision, as the administrator for an employer-sponsored

benefit plan (the "Plan"), to discontinue Plaintiff's long-term disability ("LTD") benefits. Now

before the Court are the parties' cross-motions for summary judgment (ECF Nos. 23-24). The

Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1).

For the reasons that follow, the Court concludes that Plaintiff is entitled to LTD benefits under

the Plan.

## PRELIMINARY PROCEDURAL MATTER

Before turning to the merits of the parties' positions, the Court must determine whether to resolve this case on the parties' cross-motions for summary judgment or on a trial on the administrative record. (*See* Def.'s Mot. at 2, asking the Court to resolve the parties' dispute on summary judgment or, alternatively, on a trial on the administrative record). "The answer depends on what standard of review the court applies." *Rabbat v. Standard Ins. Co.*, 894 F. Supp. 2d 1311, 1313 (D. Or. 2012).

The parties agree that the *de novo* standard of review applies here. (Pl.'s Mot. at 2; Def.'s Mot. at 2.) Another judge from this district has surveyed the law and determined that "when applying the *de novo* standard in an ERISA benefits case, a trial on the administrative record, which permits the court to make factual findings, evaluate credibility, and weigh evidence, appears to be the appropriate proceeding to resolve the dispute." *Rabbat*, 894 F. Supp. 2d at 1313. The Court agrees that a trial on the administrative record is the appropriate procedure to resolve this dispute because it turns on whether Plaintiff's treating and examining doctors' opinions are more reliable and probative of her condition than the consulting physicians' reports. *See id.* at 1322-23 (finding the ERISA plan participant's treating physicians' opinions "more reliable and probative" of the participant's condition than the administrator's consulting physicians' reports, because the treating physicians personally observed the effects of the participant's condition and assessed the credibility of his subjective reports and the consulting physicians never personally examined him). At oral argument, the parties agreed that a trial on the record is the appropriate procedure. The Court therefore issues the following findings of fact and conclusions of law, pursuant to FED. R. CIV. P. 52(a). *See Rabbat*, 894 F. Supp. 2d at 1313 (same).

**DISCUSSION**

**I.    FINDINGS OF FACT**

1.      On June 1, 2013, the law firm Davis Wright Tremaine ("DWT") hired Plaintiff—

an individual who scored in the 99th percentile on the Law School Admission Test and

graduated *magna cum laude* from Lewis and Clark Law School—as an associate attorney.

(Admin. R. ("AR") 198, 508, 1040, 1172.) In her role as an associate attorney, Plaintiff was

responsible for drafting legal memoranda, performing legal research, reviewing documents,

meeting with clients, and analyzing client matters. (AR 506, 508.) Plaintiff's "work entail[ed] a

great amount of mental processing." (AR 179; *see also* AR 1040, describing Plaintiff's work as

"very cognitively demanding" and involving "a significant amount of reading and writing").

During the first eight months of her employment, Plaintiff worked more than seventy hours per

week, and she billed approximately 145.4 hours per month. (AR 549, 948.) She had no difficulty

fulfilling her job requirements, "even during 10-14-hour days[.]" (AR 1040.)

2.      At approximately 7:00 a.m. on the morning of February 19, 2014, Plaintiff and

her spouse were walking their dog in a crosswalk when a car traveling twenty-five miles per hour

struck Plaintiff. (AR 146, 177, 506-07.) The impact threw Plaintiff's body onto the car's hood,

caused Plaintiff's head to strike and smash the windshield (see below), and caused Plaintiff to fly

twenty feet into the air before striking her head for a second time on the pavement. (AR 146,

837.)



3.      Upon arriving on the scene, emergency medical responders stabilized Plaintiff

(who had road rash on her scalp and multiple contusions) and transported her by ambulance to

the hospital. (AR 90, 151, 177.) A computed tomography ("CT") scan of Plaintiff's brain was normal and x-rays of Plaintiff's cervical spine revealed no fracture. (AR 179.) Plaintiff's CT scan did, however, reveal "a left [posterior] parietal scalp soft tissue injury." (AR 90, 190.) The emergency room physician, Arman Faroghi, M.D. ("Dr. Faroghi"), noted that Plaintiff did not lose consciousness,[1] Plaintiff complained of pain, a global headache, dizziness, and nausea, and Plaintiff's "[o]verall clinical picture is consistent with post-concussive syndrome and scalp abrasion and contusion."[2] (AR 188-91.) Plaintiff was discharged from the hospital later that day. (AR 191.)

4.      The next day, February 20, 2014, Plaintiff visited her primary care physician, Richa Uppal, M.D. ("Dr. Uppal"), complaining of a global headache, "worsening vertigo along with nausea," pain throughout her body, and pain and tightness in her neck. (AR 146.) Dr. Uppal noted that Plaintiff's spouse took a photograph of her dilated pupils and drooping eyelid after the accident. (AR 146.) Dr. Uppal diagnosed Plaintiff with a concussion, vertigo, nausea, a soft tissue injury, a neck sprain and strain, and a paraspinal muscle spasm. (AR 148.) Dr. Uppal referred Plaintiff to physical therapy and specialists to further address her concussion symptoms. (AR 148.)

5.      Plaintiff presented for her initial physical therapy evaluation on February 27, 2014. (AR 151.) Plaintiff reported that she continued to suffer from headaches, lightheadedness,

_____

[1] Plaintiff, who was "momentarily dazed and . . . bleeding" after the accident (AR 168), later clarified that she was "unsure if she lost consciousness" because she did not remember everything that happened. (AR 177, 938.) Plaintiff's reports prompted a neurologist to opine that there was "likely [a] brief loss of consciousness." (AR 179.) Plaintiff's reports also resulted in her being diagnosed with and treated for a concussion with loss of consciousness. (AR 945, 1155.)

[2] Medical literature defines post-concussive syndrome ("PCS") "as the development of at least 3 of the following symptoms: headache, dizziness, fatigue, irritability, impaired memory and concentration, insomnia, and lowered tolerance for noise and light." (AR 1217.)

PAGE 4 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

vertigo, fatigue, and neck discomfort. (AR 152.) Plaintiff's physical therapist, Curtis Persons

("Persons"), observed that Plaintiff's signs and symptoms were consistent with benign

paroxysmal positional vertigo ("BPPV"), "post-concussive headaches, and mild cervical strain."

(AR 152.)

6.      In mid-March 2014, less than one month after being struck by the car, Plaintiff

returned to work at DWT and "became dizzy and had increased headache after only 10 minutes."

(AR 154.) She also felt nauseous, anxious, and fatigued. (AR 934.) Plaintiff was only able to

work for ninety minutes. (AR 934.) Persons advised Plaintiff to avoid strenuous mental activity

"as long as [her] symptoms [were] still being provoked." (AR 154.) Plaintiff attempted to return

to work again on April 2, 2014. (AR 154.) Plaintiff worked for about three hours and continued

to feel exhausted and suffer from "worsening symptoms" despite engaging in only "minimal

activities." (AR 934.)

7.      In a report dated April 3, 2014, Jeffrey Brown, M.D. ("Dr. Brown"), a

neurologist, noted that Plaintiff was evaluated for posttraumatic dizziness. Dr. Brown determined

that Plaintiff's chronic daily headaches and dizziness were likely the result of her concussion.

(AR 170.)

8.      Also on April 3, 2014, Plaintiff visited Sean Robinson, M.D. ("Dr. Robinson"), a

physician at Oregon Health and Science University ("OHSU") who specializes in sports

medicine, for a concussion evaluation. (AR 934.) Dr. Robinson determined that Plaintiff was

"[e]ntering" PCS "as it [wa]s now 6 weeks since [the] accident and [Plaintiff was] quite

symptomatic still." (AR 937.) Dr. Robinson referred Plaintiff to Dr. Brown for a follow-up.

(AR 937.)

9.      In a report dated April 29, 2014, Dr. Brown stated that Plaintiff's test results indicated that "her issues are related to her head injury on a central and nonperipheral basis." (AR 117.)

10.     In May 2014, Plaintiff, who was actively engaged in her recovery program, attempted to return to work on a part-time basis. (AR 549, 955, 1039.) Plaintiff, however, was not able to sustain part-time work as an attorney because she continued to suffer from debilitating PCS symptoms, including, but not limited to, light and noise sensitivity, "lots of fatigue," fatigue-related dizziness, constant headaches in the mild to severe range, difficulty maintaining concentration for more than twenty minutes, difficulty reading with both eyes open, "decreased balance with eyes closed," and "wooziness with cervical extension." (AR 549, 955, 961.)

11.     Also in May 2014, Rosemary Detmer Stone, M.D. ("Dr. Detmer Stone"), an ophthalmologist, performed a neuro-optometric evaluation, which "showed convergence insufficiency, saccadic eye movement dysfunction, and mild accommodative insufficiency." (AR 1039.)

12.     On August 4, 2014, Plaintiff returned to work on a part-time basis with the intent gradually to increase her workload. (AR 549, 989.) Plaintiff, however, continued to suffer from significant concussion-related symptoms, including, but not limited to, neck pain, light and noise sensitivity, difficulty reading in excess of forty-five minutes, worsening headache pain after "visual discrimination and visual memory," impaired "peripheral and convergence . . . [which elicited] her symptoms," constant headaches, feeling "slowed down," sadness, feeling nervous or anxious, fatigue, irritability, and difficulty concentrating, remembering, proofreading, and

organizing.[3] (AR 993, 998, 1000-01, 1004, 1006.) In the months that followed, Plaintiff could not sustain full-time work on a regular and continuous basis. (AR 1016, 1019.) During this time, James Chesnutt, M.D. ("Dr. Chesnutt"), a treating concussion specialist, recommended that Plaintiff consider using Zoloft, an antidepressant, to address the changes in Plaintiff's "mood and energy" following the accident. (AR 1001-02.) Approximately one month later, Plaintiff started taking Wellbutrin, a different antidepressant, and reported feeling "a boost to her mood and energy levels." (AR 125, 1039; see also Tr. 129, informing Dr. Uppal about the "post-concussion care" provider's suggestion that Plaintiff's mood and energy deficits might improve on an antidepressant medication).

13.     On December 3, 2014, Plaintiff filed a claim for LTD benefits under the Plan. (AR 506-08.) In her application for LTD benefits, Plaintiff cited her concussion, PCS, whiplash, depression, and anxiety as the illnesses contributing to her inability to work at her occupation, and she cited the February 19, 2014 accident as the incident that caused her illnesses. (AR 506.) Plaintiff's LTD application also included an Attending Physician's Statement in which Plaintiff's primary care physician, Dr. Uppal, stated that Plaintiff can perform "75% of [her] normal workload" and that her treatment and assessment of Plaintiff was complicated by her "situational depression." (AR 164.) The record indicates that Dr. Uppal later acknowledged that Plaintiff's situational depression "could be related to the accident and the ensuing illness." (AR 1068; see also AR 1039, indicating that on April 27, 2015, Plaintiff appeared for a neuropsychological evaluation, "denied [a] history of psychiatric illness or treatment prior to the [February] 2014 accident," acknowledged "seeing a counselor and taking psychiatric medication this year to help

_____

[3] Many of these reported symptoms, including those related to Plaintiff's mood, energy, and sadness, were taken from Plaintiff's Sports Concussion Assessment Tool ("SCAT") scores. (AR 1001.)

adjust to the effects of her head injury, including changes in mood and anxiety," described her "typical mood and outlook pre-injury as generally unflappable," and stated that she now "becomes more easily upset and has less patience, especially when stressed and/or fatigued").

14.    In February 2015, DWT "direct[ed]" Plaintiff to "do more at work," even though Plaintiff continued to suffer from "extreme fatigue every day," which resulted in "significant reading and writing errors" due to Plaintiff's decreased "attention and concentration." (AR 1050.)

15.    On April 27, 2015, Dr. Chesnutt referred Plaintiff to Sarah Walker, Ph.D. ("Dr. Walker"), a neuropsychologist at OHSU, for an evaluation to determine the "nature and extent" of Plaintiff's "cognitive impairment." (AR 1038; *see also* AR 1037, stating that the referral was based on Dr. Chesnutt's "concern for persisting cognitive decrements after head injury"). Dr. Walker's evaluation included a diagnostic interview and a standardized cognitive and personality assessment. (AR 1037.) Dr. Walker also reviewed Plaintiff's medical records. (AR 1038.) Dr. Walker's results indicated that Plaintiff possessed "very superior" verbal intellect/reasoning; superior nonverbal intellect/reasoning, auditory working memory, and verbal fluency; and above average verbal and visual learning and memory. (AR 1037-38.) Dr. Walker's results, however, also indicated that Plaintiff's "[s]peed of information processing fluctuated from mildly impaired to average," and her "[c]omplex problem-solving, auditory attention, and rapidly shifting attention back and forth were also below average and considerably below what [Dr. Walker] would expect in comparison to her excellent abilities in other domains." (AR 1038.) In terms of validity, Dr. Walker observed that Plaintiff was adequately engaged and that Plaintiff's "results can be considered a valid and accurate reflection of her current abilities." (AR 1041.)

16.      On June 16, 2015, Deborah Syna, M.D. ("Dr. Syna"), a neurologist, reviewed
Plaintiff's records at Defendant's request and provided an opinion regarding Plaintiff's LTD
claim. (AR 90-92.) Dr. Syna informed Defendant that, in her opinion, Plaintiff "reached medical
stability by December 2014, although 2 of her examiners opined that there [is] a problem with
cognitive processing." (AR 91.) Dr. Syna also recommended that Defendant obtain copies of
Plaintiff's neuropsychological testing and stated that Plaintiff's medical records indicate that she
"became significantly depressed and anxious in September 2014 and that depression and anxiety
may be a barrier to return to fulltime work." (AR 91-92.) The medical record indicates that on
April 3, 2014, Plaintiff endorsed feeling sad, more emotional than usual, and nervous or anxious
and that Dr. Robinson considered and documented these concussion symptoms in calculating
Plaintiff's SCAT score. (AR 934-35.) The medical record also indicates that Plaintiff did not
have a history of psychiatric illness or treatment prior to the February 19, 2014 accident.
(AR 1039.)

17.      On July 1, 2015, Defendant approved Plaintiff's LTD claim through December
12, 2014. (AR 321.) Defendant determined that there was insufficient documentation to support
finding Plaintiff disabled beyond December 12, 2014, because it did not have a copy of
Plaintiff's "neuropsychological evaluation supporting ongoing cognitive impairment, or medical
records documenting that [Plaintiff's] depression and anxiety persisted beyond [that date]."
(AR 326.)

18.      On December 10, 2015, Dr. Chesnutt, Plaintiff's treating concussion specialist,
reviewed Plaintiff's records and provided an opinion regarding Plaintiff's ability to sustain full-
time work. (AR 930-32.) Dr. Chesnutt stated that Plaintiff continued to be "partially disabled" by
her PCS, that Plaintiff "returned to work as an attorney on a part-time basis, but still experiences

daily headaches, neck pain, and sensitivity to light and noise and struggles with fatigue and cognitive issues," that Plaintiff's "symptoms combine to limit her ability to function as an attorney," that the longer Plaintiff's "symptoms persist, the less likely a full resolution of her [PCS] will occur," and that it is "quite possible" that Plaintiff "will remain partially disabled indefinitely." (AR 931-32.)

19.     On December 16, 2015, Dr. Chesnutt observed that Plaintiff was suffering from "persistent" PCS "symptoms 1 year and 9 months after [the] accident." (AR 1098.) These patients are "likely" to experience persistent symptoms that may impose "lifelong disability." (AR 1224.)

20.     Also on December 16, 2015, Dr. Chesnutt referred Plaintiff to Dr. Walker for re-evaluation based on "persisting concerns for cognitive functioning, with persistent functional impact." (AR 919.) Dr. Walker found that Plaintiff met the diagnostic criteria for a mild neurocognitive disorder due to traumatic brain injury ("TBI"), based on her "persisting/worse difficulty in visual attention, visual scanning, auditory working memory, and maintaining a given approach to a task." (AR 924.) Dr. Walker stated that Plaintiff's "performance validity/effort was within, if not stronger than, normal limits." (AR 921.) In addition, Dr. Walker endorsed Plaintiff's LTD claim:

> [Plaintiff's] cognitive profile would typically be well-suited to fulfill the requirements of most jobs, [but Plaintiff's] position is particularly high-demand. Consistent with her report, she . . . did encounter difficulty doing [complex cognitive tasks] as quickly as would be expected, given her age, education, and superior abilities in other domains. I suspect that the fact that she has maintained her [part-time] position [as an associate attorney] is [a] testament to her intellect, resourcefulness, and work ethic. At the same time, her work has been an increasing source of distress lately and I suspect that it largely due to cognitive obstacles that she has faced since sustaining [a] head injury in 2014.

(AR 924.)

PAGE 10 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

21.     Also in late 2015, Plaintiff's spouse, family members, and legal secretary submitted testimonial letters corroborating Plaintiff's reported symptoms and work limitations. (AR 1168-79.)

22.     On February 3, 2016, Laurence Binder, Ph.D. ("Dr. Binder"), a consulting neuropsychologist, reviewed Plaintiff's records at Defendant's request and submitted an opinion. (AR 890-900.) Dr. Binder determined that Plaintiff exhibited good effort during Dr. Walker's evaluations, Dr. Walker's evaluations were abnormal, Dr. Walker failed adequately to consider Plaintiff's symptoms of depression and anxiety, anxiety and depression explain Plaintiff's "ongoing symptoms," concussion-related limitations and restrictions resolved in early December 2014, and Plaintiff is capable of sustaining full-time work as an associate attorney. (AR 898-900.)

23.     On February 21, 2016, Morad Daniel, M.D. ("Dr. Daniel"), a neurologist, reviewed Plaintiff's records and Dr. Binder's opinion at Defendant's request and submitted his own opinion. (AR 878-87.) Dr. Daniel determined that Plaintiff's diagnoses of "concussion (mild traumatic brain injury) on February 19, 2014 and subsequent" PCS are supported by the medical record; that as of December 2014, Plaintiff "had likely reached maximal medical improvement with regard to the physical residuals" of PCS; that Plaintiff "may have continued to have limitations and restrictions precluding full-time work beyond December 2014 due to mental conditions"; and that Plaintiff was able to "work 40 hours per week starting in August 2014." (AR 884-86.)

24.     In a letter dated June 15, 2016, Defendant stated that it reviewed Plaintiff's claim file and determined that Plaintiff was due additional LTD benefits through September 15, 2016, due to a mental disorder. (AR 296.) Defendant explained that the Plan "limits payment of LTD

benefits to a maximum of 24 months for conditions caused or contributed to by a Mental

Disorder," such as depression and anxiety. (AR 296.) In support of its decision, Defendant cited

Dr. Syna's opinion that Plaintiff became significantly depressed and anxious in September 2014.

(AR 297.)

25.    On September 16, 2016, Plaintiff's law firm terminated her because she "failed to

meet firm standards for billable hours and profitability," according to the Oregon Employment

Department. (AR 872; *see also* AR 822, 839, 842, noting that the reason for Plaintiff's

termination was that "she was not able to keep up with the work load, pace and expected level of

performance at work").

26.    On November 10 and November 11, 2016, Plaintiff was referred to Glenn

Goodwin, Ph.D. ("Dr. Goodwin"), for a neuropsychological consultation. (AR 820-36.)

Dr. Goodwin reviewed Plaintiff's medical records, conducted a clinical interview, and

administered tests. (AR 820-21.) Dr. Goodwin noted that performance validity testing indicated

"consistent, optimal effort." (AR 829.) Dr. Goodwin used the Minnesota Multiphasic Personality

Inventory-2-Restructured Form ("MMPI-2-RF"), a "current and customary method[] for

assessing symptom validity [which] is considered an accepted and objective instrument routinely

used in clinical and forensic neuropsychology." (AR 830.) Based on the MMPI-2-RF, Dr.

Goodwin determined that there were no concerns with validity or "indications of over reporting

or under reporting of symptomatology." (AR 830.) Dr. Goodwin added that his validity

impression was that Plaintiff's "overall picture is one of acceptable results on both performance

and symptom validity testing." (AR 830.) In addition, Dr. Goodwin stated that: (1) he reviewed

Dr. Walker's evaluations and summary of the raw test data and generally concurred with her

clinical impression; (2) his evaluation revealed "significant weakness on a task of complex visual

learning" and "evidence of statistically significant weaknesses in processing speed, memory processing and on some tasks of attention and concentration dependent on processing speed and on both simple and complex sequencing, also dependent on processing speed"; (3) the foregoing areas of weakness "represent a significant decline" from Plaintiff's estimated preinjury level of ability; (4) Plaintiff had "no primary mental health features" at the time of Dr. Goodwin's evaluation; (5) there is "no reason to discount" Plaintiff's subjective complaints, which "generally reveal ongoing neurocognitive difficulties she is experiencing in daily life"; and (6) it is "quite clear" that Plaintiff is "not work tolerant from a neuropsychological standpoint with respect to the type of competitive employment situation she was in at the time of this injury event" because she is dealing with residuals stemming from TBI. (AR 834-36.)

27.    On December 5, 2016, Dr. Chesnutt, Plaintiff's treating concussion specialist, stated that Dr. Goodwin's findings were expected and consistent with his own observations while treating Plaintiff between April 3, 2014 and December 5, 2016. (AR 840-42.) Dr. Chesnutt added that he agreed with Dr. Goodwin's conclusion that "due to relative cognitive weaknesses, particularly in processing speed, memory processing and attention and concentration, complex visual learning (as well as due to fatigue and a lack of stamina when she tried to work) [Plaintiff] is unable to work in her prior occupation, which was stressful and demanded excellent cognition." (AR 842.) He also stated that he expected Plaintiff's disability to be permanent. (AR 842.)

28.    On December 28, 2016, Plaintiff's spouse submitted a second letter detailing Plaintiff's continued struggles and corroborating Plaintiff's self-reports regarding her TBI. (AR 874-75.)

29.     On December 30, 2016, Plaintiff appealed Defendant's June 15, 2016 decision extending benefits through September 15, 2016. (AR 266.)

30.     On May 5 and May 31, 2017, Dr. Binder and a new neuropsychological consultant, James Boon, Ph.D. ("Dr. Boone"), reviewed Plaintiff's claim file at Defendant's request and determined that Dr. Goodwin's test results were invalid due to "numerous performance inconsistencies" and Plaintiff's "failing" performance on a validity test. (AR 781-90, 800-05.)

31.     In a letter dated June 1, 2017, Defendant informed Plaintiff that it did "not find medical evidence to support a conclusion [that she] continues to have cognitive deficits due to a neurocognitive disorder that would preclude her from performing her Own Occupation as an attorney for any employer." (AR 245-46.) Accordingly, Defendant closed Plaintiff's LTD file. (AR 246.)

32.     Plaintiff filed this ERISA action on January 31, 2018. The parties' motions followed.

## II.     CONCLUSIONS OF LAW

### A.     Legal Standards

1.     ERISA provides that a plan "participant" may bring a civil action in federal court "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B); *see also Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 108 (2008) ("The [ERISA] permits a person denied benefits under an employee benefit plan to challenge that denial in federal court.").

2.     "ERISA does not set forth the appropriate standard of review for actions challenging benefit eligibility determinations." *Rabbat*, 894 F. Supp. 2d at 1319 (citing *Firestone*

PAGE 14 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

*Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 (1989)). The parties have stipulated to *de novo* review. (Pl.'s Mot. at 2; Def.'s Mot. at 2.) The Court accepts the parties' stipulation and reviews the record *de novo*. *See Rabbat*, 894 F. Supp. 2d at 1319 (accepting the same stipulation and noting courts may accept a stipulation to *de novo* review). "When conducting a *de novo* review of the record, the court does not give deference to the claim administrator's decision, but rather determines in the first instance if the claimant has adequately established that he or she is disabled under the terms of the plan." *Muniz v. Amec Constr. Mgmt.*, 623 F.3d 1290, 1295-96 (9th Cir. 2010). The *de novo* standard of review places the burden of proof on the claimant. *Id.* at 1294.

**B.    The Plan**

3.      The Plan defines disability as follows: "You are Disabled from your Own Occupation if, as a result of Physical Disease, Injury, Pregnancy or Mental Disorder, you are unable to perform with reasonable continuity the Material Duties of your Own Occupation." (AR 630.) "Own Occupation" is defined as employment of "the same general character as the occupation you are regularly performing for your Employer when Disability begins." (AR 631.) "Material Duties" is defined as "the essential tasks, functions and operations, and the skills, abilities, knowledge, training and experience, generally required by employers from those engaged in a particular occupation that cannot be reasonably modified or omitted." (AR 631.) Additionally, the Plan provides that if your Own Occupation requires a professional or occupational license, the scope of your Own Occupation is "as broad as the scope of your license." (AR 631.)

4.      The Court finds that Plaintiff's Own Occupation as an attorney involves a significant amount of reading and writing, and a high level of cognition and mental acuity. (AR 179, 1040); *see also Teicher v. Regence Health & Life Ins. Co.*, 562 F. Supp. 2d 1128, 1139

(D. Or. 2008) (finding that the occupation of attorney "demands a high level of mental acuity and the ability to synthesize rapidly, to integrate, and to make use of voluminous amounts of information to advance the interests of h[er] clients"). The Court is "also well aware of the high professional and ethical standards required by the Oregon State Bar and Oregon Courts as to a lawyer's representation of clients and their interests." *Id.*

5.    The Court further finds that the ability to work more than forty hours per week is a Material Duty of Plaintiff's Own Occupation as an attorney, as Defendant acknowledges. (Def.'s Resp. Pl.'s Mot. Summ. J. at 2.)

**C.    Plaintiff is Entitled to LTD Benefits**

6.    Defendant argues that Plaintiff has failed to meet her burden of proving that a physical injury prevented her from performing her Own Occupation beyond September 2016. (Def.'s Mot. at 16.) Citing the opinions of Defendant's non-examining record reviewers, Drs. Binder, Boone, and Daniel, Defendant contends that Plaintiff's claim that she continues to suffer from a TBI rests on invalid test results; Dr. Walker ignored psychological factors as an explanation for Plaintiff's "atypical regression after she had returned to baseline"; Plaintiff failed to demonstrate "valid effort" during Dr. Goodwin's evaluation; it would be "uncommon" for Plaintiff's TBI symptoms to persist this long; and there is "no credible evidence" that Plaintiff's regression is related to her TBI. (Def.'s Mot. at 16-17.)

7.    The Court finds that Plaintiff has adequately established that she is disabled under the terms of the Plan. The doctors who personally examined and/or treated Plaintiff concluded that she is disabled. For example, Dr. Chesnutt, a concussion specialist who treated Plaintiff for over two years and who has treated "many patients who have suffered concussions as the result of sports, motor vehicle, and other accidents," issued an opinion on December 5, 2016, stating that due to TBI/PCS-related "cognitive weaknesses, particularly in processing speed, memory

processing and attention and concentration, complex visual learning (as well as due to fatigue and a lack of stamina when she tries to work)," Plaintiff is "unable to work in her prior occupation, which was stressful and demanded excellent cognition." (AR 840-42.) He added that he expected Plaintiff's "disability to be permanent" based on how long her symptoms persisted and he expected "modest, if any, improvement." (AR 842.) In addition, Dr. Chesnutt stated that, by all accounts, Plaintiff "enjoyed her career and struggled mightily to continue to work," and that he agreed with the opinion and findings of the examining neuropsychologist, Dr. Goodwin. (AR 842.)

    8.    Dr. Goodwin performed a neuropsychological evaluation on November 10 and November 11, 2016, and determined that it was "quite clear" that due to residuals stemming from TBI, Plaintiff is "not work tolerant from a neuropsychological standpoint with respect to the type of competitive employment situation she was in at the time of this injury event." (AR 835.) In addition, Dr. Goodwin observed that there are several "areas of neurocognitive impairment that would preclude [Plaintiff's] ability to execute adequate cognitive functioning day in and day out in a stressful environment, where there is pressure to perform at a high level." (AR 836.) Dr. Goodwin also generally concurred with Dr. Walker's opinion and findings. (AR 834.)

    9.    Dr. Walker performed neuropsychological evaluations on April 27, 2015, and December 16, 2015. Dr. Walker acknowledged that it is "uncommon," but not unheard of, for TBI/PCS symptoms to persist as long as Plaintiff's and she could not "rule out other potential causes," but Dr. Walker nevertheless determined that Plaintiff's profile was "primarily very strong" and that Plaintiff meets the diagnostic criteria for a mild neurocognitive disorder due to a TBI. (AR 924; *see also* AR 830, indicating that Dr. Goodwin's evaluation produced a "valid

profile"). Dr. Walker also stated that she suspected that the fact that Plaintiff had "maintained her position is [a] testament to her intellect, resourcefulness, and work," and that Plaintiff's cognitive profile is not well-suited for the "particularly high-demand" position of a practicing attorney. (AR 924.)

10.     The opinions of Drs. Chesnutt, Goodwin, and Walker alone are persuasive evidence that Plaintiff's TBI/PCS symptoms prevent her from performing her Own Occupation. *See Rabbat*, 894 F. Supp. 2d at 1320 ("[E]vidence showing that the doctors who personally examined the claimant concluded that he was disabled, even though insurance company's non-examining physicians found otherwise, support[s] finding that the claimant was disabled under terms of the plan" (citing *Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 676-79 (9th Cir. 2011)).

11.     Defendant contends that its consulting physicians, Drs. Binder, Boone, and Daniel, provided a more reliable assessment of Plaintiff's condition. When a court engages in *de novo* review, it may evaluate and give credence to the opinions that it finds more reliable and probative. *See Rabbat*, 894 F. Supp. 2d at 1322-23 (according more weight to the physicians who personally examined the claimant because the court found them to be more reliable and probative and noting that the administrator's consulting physicians never personally examined the claimant and thus were never able to observe the effects of his condition or assess the credibility of his self-reports). For the reasons explained below, the Court finds the opinions of Drs. Chesnutt, Goodwin, and Walker more reliable and probative of Plaintiff's condition than the consulting physicians' reports.

12.     As an initial matter, the Court finds Plaintiff's treating and examining physicians' opinions more reliable and probative of her condition because, unlike the consulting physicians,

Plaintiff's treating and examining physicians were able personally to examine her, observe the effects of her TBI/PCS, and assess the credibility of her self-reports. *See Rabbat*, 894 F. Supp. 2d at 1322-33 (same). Plaintiff's treating and examining physicians' assessments of her condition and credibility weigh strongly in her favor. (*See* AR 829-36, stating that there are a "number of areas of neurocognitive impairment that would preclude [Plaintiff's] ability to execute adequate cognitive functioning day in and day out in a stressful environment where there is pressure to perform at a high level," Plaintiff showed "good effort and motivation on tasks," stand alone and selected embedded measures were "all essentially within accepted ranges indicating consistent, optimal effort," there "were no unusual patterns of reporting," Plaintiff's profile is valid, there were "no concerns with protocol validity," there were "no indications of over reporting or under reporting of symptomatology," Dr. Goodwin's overall validity impression was "one of acceptable results on both performance and symptom validity testing," there "were no concerns with symptom validity which is consistent with her clinical presentation," Plaintiff "produced valid studies with respect to effort and motivation to perform at an optimum level," Dr. Goodwin found Plaintiff to be "genuine in her clinical presentation," and there was "no hint of over involvement in symptomatology nor any sense of secondary gain in her demeanor"; AR 842, opining that Plaintiff is permanently disabled and stating "it is important to bear in mind that by all accounts she thoroughly enjoyed her career and struggled mightily to continue to work" after the accident; AR 921-25, opining that Plaintiff's profile is not well-suited for her past work as an attorney and stating that "[p]erformance on embedded measures of performance validity/effort was within, if not stronger than, normal limits," Plaintiff's profile is "primarily very strong," and the fact that Plaintiff "maintained her position is [a] testament to her intellect, resourcefulness, and work ethic").

13.    The Court also finds the opinions of Drs. Chesnutt, Goodwin, and Walker more reliable and probative of Plaintiff's condition because: (1) Dr. Chesnutt, a long-time treating concussion specialist, endorsed Dr. Goodwin's conclusion regarding Plaintiff's inability to work as an attorney and stated that Dr. Goodwin's findings were generally consistent with his treatment observations; and (2) Dr. Goodwin, a neuropsychologist, reviewed the data underlying Dr. Walker's exams and generally concurred with her observations regarding varying test scores. (*See* AR 834, "I did review Dr. Walker's raw test data in both of her reports . . . . I generally concur with the observations made by Dr. Walker related to the fluctuations seen across [her tests] and have no concerns about her explanations."; AR 842, "I have reviewed Dr. Glenn Goodwin's recent neuropsychological report. Dr. Goodwin's findings are generally consistent with my observations and do not surprise me. I agree with his conclusion that due to relative cognitive weaknesses, particularly in processing speed, memory processing and attention and concentration, complex visual learning (as well as due to fatigue and a lack of stamina when she tries to work) she is unable to work in her prior occupation, which was stressful and demanded excellent cognition.").

14.    Furthermore, the Court is not persuaded by Defendant's consulting physicians' rejection of Plaintiff's treating and examining physicians' opinions. Defendant's consulting physicians opined that Dr. Goodwin's and Dr. Walker's neuropsychological evaluations were not persuasive because Plaintiff failed a freestanding performance validity test known as the Test of Memory Malingering ("TOMM"), and because Plaintiff produced fluctuating scores during her evaluations. (AR 785.) The administrative record, however, reveals that Plaintiff passed several other validity measures administered by Drs. Walker and Goodwin and that Dr. Goodwin reviewed Dr. Walker's raw test data and had no concerns about Dr. Walker's explanations

regarding the fluctuations seen during Plaintiff's prior neuropsychological evaluations. (*See* AR 834, "I did review Dr. Walker's raw test data in both of her reports . . . . I generally concur with the observations made by Dr. Walker related to the fluctuations seen across these two testings and have no concerns about her explanations. Results of the current study were compared with the results from [Dr. Walker's recent evaluation]."; AR 782-83, stating that on April 27, 2015, "Dr. Walker administered two embedded performance validity measures that were passed," on December 18, 2015, "Dr. Walker administered two embedded performance validity measures that were passed," and in November 2016, Dr. Goodwin "reported passing performance on other validity measures" and stated that the TOMM score was "just below the desired cutoff"; *see also infra* Part II.C.12). That is significant because there is no reasonable basis in the record for concluding that Drs. Binder and Boone, who did not have the benefit of personally administering the tests in question or observing Plaintiff's performance on those tests, are more qualified to assess neuropsychological data than the examining neuropsychologists, Drs. Goodwin and Walker. Accordingly, the Court finds that Dr. Walker's and Dr. Goodwin's evaluations are not invalid. (*See* Def.'s Resp. Pl.'s Mot. Summ. J. at 8, explaining that "[a]ll that matters is that [Plaintiff's] evidence that her physical limitations were severe enough to prevent her from working more than 40 hours—[Dr. Goodwin's] 2016 neuropsychological exam—was invalid"; *see also* Def.'s Resp. Pl.'s Mot. Summ. J. at 2, stating that under the Plan, an ability to work more than forty hours per week is a "Material Duty" of Plaintiff's "Own Occupation").

15.    Defendant's consulting physicians' opinions also rest largely on an assumption that Plaintiff achieved near full recovery in December 2014. (*See* AR 243, "Dr. Binder stated the medical records support as of December 2014 that [Plaintiff's TBI/PCS] had resolved."; AR 245, "As of December 2014 [Plaintiff] had recovered from the sequelae of her TBI[.]"). The

administrative record indicates that Plaintiff reported working forty hours a week in early
December 2014. (AR 1021-22.) The administrative record, however, also indicates that: (1)
Plaintiff reported that she was exhausted after participating in five days of arbitration and she
continued to have a hard time blocking out noise (AR 1021-22); (2) as of December 5, 2014, Dr.
Chesnutt found that Plaintiff was slowly improving, but Dr. Chesnutt also found that she "had
continuing concussion symptoms of neck pain and difficulty concentrating as well as continuing
vision problems and [she] felt slowed down, fatigued, more emotional than usual, irritable, and
[she had] difficulty remembering, sensitivity to light and sensitivity to noise" (AR 840); (3)
Plaintiff only billed 27.4 hours in December 2014 (AR 549); (4) between 2014 and 2016,
Plaintiff could not sustain full-time work on a continuous and regular basis; and (5) on
September 16, 2016, Plaintiff was terminated because she could not maintain an associate
attorney's workload, pace, and expected level of performance. (AR 822, 839, 842, 872.)
Accordingly, the record does not support a finding that Plaintiff achieved near full recovery by
December 2014.

16.    In addition, Defendant's consulting physician, Dr. Boone, determined that it is
"not credible" that Plaintiff "continued to experience cognitive deficits more than three years"
after the accident. (AR 788.) In support of his opinion, Dr. Boone notes that it is "well
documented that an uncomplicated concussion (i.e., a concussion that did not result in the brain
scan abnormalities) resolves in the *vast majority* of cases within 3 months," "the bulk of the
evidence indicates that mild [TBI] 'is *most often* followed by a favorable course of cognitive
recovery over a period of days to weeks with no indication of permanent impairment on
neuropsychological testing by three months post-injury,'" and Dr. Walker commented that it
would be "uncommon" for symptoms of a mild TBI to persist as long as Plaintiff's. (AR 788)

(emphasis added). However, the record supports a finding that recovery from a TBI varies among individuals. (*See* Def.'s Resp. Pl.'s Mot. Summ. J. at 7, "[T]he timeline for improvement from a concussion varies among individuals[.]"). In fact, medical literature reports that roughly "15% of [PCS] patients complain of problems *more than* 12 months after injury," and these patients are "likely to experience persistent and intrusive symptoms that may be refractory to treatment and impose a lifelong disability." (AR 1224) (emphasis added). Although Defendant's consultants refer to this literature as "selective" and question whether it provides "an accurate summary of the scientific evidence" (AR 881, 886, 900), Plaintiff's treating "concussion specialist" (AR 91) concluded that Plaintiff is among the PCS patients whose symptoms persist and render them disabled. (*See* AR 1098, observing that Plaintiff was suffering from "persistent" PCS "symptoms 1 year and 9 months after [the] accident"; *see also* AR 931-32, stating that the longer Plaintiff's PCS symptoms "persist, the less likely a full resolution of her [PCS] syndrome will occur" and it is "quite possible that she will remain partially disabled indefinitely"; AR 842, "I expect this [patient's] disability to be permanent and would expect modest, if any, improvement."). Plaintiff's examining neuropsychologists also support a finding of long-term disability.

17.    In addition to the medical evidence, the statements provided by Plaintiff's legal secretary supports a finding that Plaintiff is unable to work as an associate attorney as the result of her TBI/PCS symptoms. *See Rabbat*, 894 F. Supp. 2d at 1323 (finding a former supervisor's statements to be persuasive evidence supporting a finding that the claimant was totally disabled). Indeed, Plaintiff's legal secretary, Susan England ("England"), observed that, after the accident, Plaintiff's concentration and stamina decreased, Plaintiff often looked tired, and Plaintiff suffered from "headaches constantly." (AR 1171.) England also observed that Plaintiff often

needed to work in an office so dark that England could not "even see," Plaintiff "cannot work with the overhead lights and frequently suffers from eye strain resulting in headaches from either the lights or the computer screen," Plaintiff "tried various options to help with the headaches and eye strain such as using colored transparency sheets over the computer screen and exercising her eyes with specialty vision cards," and Plaintiff kept "her office door shut most of the time to eliminate distracting noise" that impaired her ability to concentrate. (AR 1171.) In addition, England observed that Plaintiff's "ability to remember the details of her cases . . . diminished somewhat since the accident," Plaintiff asked for more reminders, England had to be "vigilant in checking deadlines" on Plaintiff's calendar and proofread Plaintiff's work "more carefully," and Plaintiff experienced fatigue even when working a reduced schedule. (AR 1171.)

18.    The statements provided by Plaintiff's spouse—who attended undergraduate and graduate school with Plaintiff and who worked as an associate attorney at a Portland law firm— is also persuasive evidence that Plaintiff cannot work as an associate attorney as the result of her TBI/PCS symptoms. *See Rabbat*, 894 F. Supp. 2d at 1323. Plaintiff's spouse explained that, before the accident, "[t]here was no one else [she] knew in law school or in [the] first couple of years post-law school who could digest large amounts of case law so quickly, find an answer to a legal question in a matter of minutes that had taken others days to try to find, quickly grasp complex legal concepts, concisely articulate her analysis, and work hour after hour without much break." (AR 1173.) Plaintiff's spouse further explained that she "now watch[es] a person who exerts extraordinary effort and still does not accomplish the things she could do before with such ease and success." (AR 1174.) For example, Plaintiff "needs a very particular environment to just make it through the day with only a mild to moderate headache, without feeling sick, or being completely exhausted"; Plaintiff "struggles to process information, to keep up with the

regular pace of conversation, focus, and to remember/recall things"; Plaintiff "struggles at times

to track . . . conversations, forgetting her train of thought midway through a sentence or

everything [her spouse] said if [her] comment contained more than one question or idea";

Plaintiff "tends to speak and process information more slowly than she did before, especially

[when] talking about something more tasking such as scheduling"; Plaintiff does not "seem able

to focus"; Plaintiff seems nearly incapable of multitasking and coping with distraction; and

Plaintiff has experienced considerable difficulty performing her legal work in the same manner

she did before the accident. (AR 1174-75; *see also* AR 1175, explaining that Plaintiff used to

perform her legal work, communicate with clients, and track her billable hours while using

"timer buttons" on her computer, but "now she can't multitask in this way" so she lets client calls

go to voicemail, stops working on her legal brief, clicks off the timer, listens to the voicemail,

calls the client, checks the call duration, and logs the time before returning to her brief, which

greatly impairs Plaintiff's ability to "meet billable expectations and her colleagues' and clients'

expectations for quickly switching tasks when the phone rings or someone walks in the office";

AR 874, stating that every day at DWT "seemed like a major struggle to make it through the

day," even though Plaintiff's spouse and legal secretary provided a significant amount of

assistance). In addition, when Plaintiff reads complex material or reviews voluminous records,

she is easily fatigued and suffers from "incapacitating headache[s]." (AR 1176.)

19.    In aggregate, the evidence discussed above demonstrates that Plaintiff suffers

from debilitating TBI/PCS symptoms, including, but not limited to, fatigue, lack of stamina,

incapacitating headaches, and cognitive weaknesses, particularly in processing speed, memory

processing, attention and concentration, and complex visual learning. These issues significantly

impair Plaintiff's ability to perform her Own Occupation. Accordingly, the Court concludes that,

as a result of a TBI/PCS, Plaintiff is and has been unable to perform with reasonable continuity the material duties of her Own Occupation. (*See* Def.'s Resp. Pl.'s Mot. Summ. J. at 2, stating that Plaintiff "has not worked more than 40 hours a week and [Defendant] acknowledges that the ability to do so is a Material Duty of her Own Occupation," and Plaintiff must prove that her TBI/PCS prevented her from working "with reasonable continuity more than 40 hours a week as an attorney as of September 16, 2016").

### D.    Mental Disorders

20.    The Plan limits LTD benefits to a maximum of twenty-four months for "each period of continuous Disability caused or contributed by . . . Mental Disorders," such as depression and anxiety. (AR 644.)

21.    Defendant contends that Plaintiff is not entitled to full reinstatement of her LTD benefits because she failed to demonstrate that her continuous disability was not caused or contributed to by a Mental Disorder. (*See* Def.'s Reply at 2, stating that to prevail in this lawsuit, Plaintiff must prove, *inter alia*, that "a non-limited condition is the exclusive cause" of her continuing disability). The Court disagrees. As discussed above, Plaintiff has adequately established that her TBI/PCS symptoms prevent her from working with reasonable continuity more than forty hours a week in her Own Occupation. Furthermore, the administrative record reveals that Plaintiff had no mental disorder prior to the accident, and any post-accident changes in her mental condition were temporary and symptomatic of her TBI/PCS. (*See* AR 125; 129; 148, 820-36; 840-42; 874-75; 919-27; 930-32; 934-35; 1001-02; 1039; 1068; 1171-76.)

### E.    Interest Rate

22.    Plaintiff requests that the Court order Defendant to pay prejudgment interest at Washington's statutory rate of twelve percent per year, WASH. REV. CODE § 4.56.110, rather than the much lower rate prescribed in 28 U.S.C. § 1961. (Pl.'s Mot. at 33.) Plaintiff

acknowledges that she needs to present evidence demonstrating why she is entitled to a rate

higher than the rate set out in § 1961, and therefore requests the opportunity to present such

evidence. (Pl.'s Reply at 21.) The Court defers ruling on this matter at this time. The parties shall

meet and confer to address the applicable interest rate. If the parties are unable to reach an

agreement on this issue within 30 days of this Order, Plaintiff shall file a motion addressing the

issue.

### F.    Clarification of Rights

23.    Plaintiff argues that she is entitled to clarification of her right to future benefits.

(Pl.'s Mot. at 33.) In her complaint, Plaintiff requests that the Court declare that Defendant "shall

pay Plaintiff a monthly LTD benefit in the gross amount of $5,875.01 from the date of judgment

until Plaintiff reaches the age of 65, so long as Plaintiff remains disabled under the terms" of the

Plan. (Compl. at 7.) In response, Defendant argues, among other things, that Plaintiff "has

presented no evidence that her condition is a lifelong . . . condition." (Def.'s Resp. Pl.'s Mot. at

10.)

24.    ERISA provides that a plan participant may bring a civil action to clarify her

rights to future benefits under the terms of an ERISA plan. 29 U.S.C. § 1132(a)(1)(B). In *Gorena

v. Aetna Life Ins. Co.*, No. 17-cv-00532, 2018 WL 3008873, at *7 (W.D. Wash. June 15, 2018),

for example, the district court reviewed an ERISA benefits determination *de novo*, found in favor

of the plaintiff, and, in accordance with § 1132(a)(1)(B), clarified the plaintiff's rights to future

benefits. *Id.* Specifically, the district court ordered the administrator to pay the plaintiff's LTD

claim "to the policy's maximum benefit duration" so long as: (1) there was no showing of

"improvement in her medical condition such that a reasonable physician would conclude that

she" was no longer disabled; and (2) it was consistent with the terms and conditions of the plan.

*Id.*

PAGE 27 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

25.    Contrary to Defendant's argument, Plaintiff has presented credible evidence indicating that it is "likely" that Plaintiff's debilitating TBI/PCS symptoms are "permanent" and would prevent her from working more than forty hours a week in her Own Occupation. (*See, e.g.*, AR 842, "[Plaintiff] is unable to work in her prior occupation [as an attorney], which was stressful and demanded excellent cognition. . . . Given the length of time since her injury, I expect this disability to be permanent and would expect only modest, if any, improvement."). Accordingly, and in accordance with § 1132(a)(1)(B), the Court offers the following clarification regarding Plaintiff's right to future benefits: Subject to the terms and conditions of the Plan, Defendant shall pay Plaintiff's LTD claim to the Plan's maximum benefit duration absent a showing of improvement in her TBI/PCS symptoms such that a reasonable physician would conclude that Plaintiff could work more than forty hours per week in her Own Occupation.

///

///

///

///

///

///

///

///

///

///

///

///

**CONCLUSION**

The Court construes Plaintiff's and Defendant's motions for summary judgment (ECF Nos. 23 and 24) as motions for judgment pursuant to FED. R. CIV. P. 52(a). The Court DENIES Defendant's motion for judgment (ECF No. 23) and GRANTS Plaintiff's motion for judgment (ECF No. 24).

The Court DECLARES that Plaintiff is entitled to LTD benefits under the terms of the Plan. The parties shall meet and confer to address the specific amount of back benefits and the applicable interest rate, as well as a reasonable attorney fee and cost award. The parties shall submit a stipulated proposed form of judgment. If the parties are unable to reach agreement on these issues within 30 days of this Order, Plaintiff shall file a motion setting forth any issues that remain to be resolved by the Court.

**IT IS SO ORDERED.**

DATED this 7th day of May, 2019.

_____
STACIE F. BECKERMAN
United States Magistrate Judge